ORANGE   COUNTY.—HON. R. C. COLEMAN, SURROGATE.—April, 1885.

STEBBINS *v.* HART.

*In the matter of the probate of the will of* JOHN WILSON, *deceased.*

Declarations, by an alleged testator, that he did not want the government to get his property, and that he did not intend to leave anything to certain relatives,—

*Held,* to imply an intention to make a will.

Allegations of the exercise of undue influence over a decedent, in respect to the testamentary disposition of his property, must be proved like any other material fact. Their truth cannot be guessed out.

Upon the hearing of a special proceeding instituted to procure probate of decedent's will, which, after bequeathing certain pecuniary legacies, gave the residue to a person therein named, proponent called, as a witness, a legatee who had released his interest to the temporary administrator, to testify to communications between himself and decedent. Contestants objected to the admission of this paper and testimony on the ground that the former did not discharge the legacy, or, if it did, that it effected an assignment to the residuary legatee,—the witness being, in either case, incompetent under Code Civ. Pro., § 829.—

*Held,* that both the paper and the testimony were competent, and should be received.

PETITION for the probate of decedent's will, presented by John L. Hart, therein nominated sole executor thereof; opposed by Angelina Stebbins and others, decedent's next of kin. The facts appear in the opinion and note.

B. R. CHAMPION, *for executor.*

H. BACON, *for contestants.*

THE SURROGATE.—I am of opinion that the formal execution of this will has been legally proved, and that the testator, at the time of such execution, was legally competent to make a will.

Although John Wilson was nearly, or quite eighty years of age at this time, and had been for many years addicted to the use of liquor, latterly even excessively, up to the time of his last illness his mental capacity was good. This illness, which finally resulted in death, whether brought on by the excessive use of liquor or by a malarial fever, undoubtedly very much enfeebled him, during that illness, both in body and mind; but he was very far from being without any mind. So little mental capacity, when uninfluenced or unperverted by delusion, is required by law to make a valid testamentary disposition of property, that it is quite difficult to determine the point at which legal mental capacity ends

In determining Wilson's mental condition during his sickness, the conduct of the parties surrounding him during that time has had quite as much influence with me as their stated opinions upon the trial. I have yet to discover that any of them treated Wilson

then as if they then believed him not to be in possession of his mental faculties, so as not to appreciate or remember their treatment of him. Certainly, Herman Kidd believed Wilson to be all right on that Sunday morning, when, at Wilson's request, he sent for "Squire" Hart, to make a new will, in which he was to be remembered.

I do not understand that there is any pretence that Wilson was influenced in making his will by a perverted or unsound condition of mind; but what is claimed by the contestants is that, at the time of making the will, his mental faculties had become so weakened as to render him incapable of making a valid will, or as to render him the subject of undue influence, in the making of the will now offered for probate. In determining whether either of these propositions is true, it is necessary to consider the disposition of property undertaken to be made by the will, and Wilson's character and surroundings.

He was a very old man, with many marked peculiarities; and upon the whole, a very uninteresting person. He lived by himself, in filth, with mean provisions for his support, although able to provide better, not knowing, so far as the proof shows, of any living relative. Nor had he any friendships, so noticeable that any who knew him well would at once recognize his probable beneficiaries. He had, in early life, lived in Charles Kidd's family; and, after his death, Wilson kept up friendly relations with several members of that family. Many years ago, he also formed the acquaintance of Allen Oldham and his family, and had manifested what was, for him, a very considerable interest in one of his children, a daugh-

ter, now about twenty years of age, having bestowed upon her the only favors shown by him to any one, except in his habit of freely inviting others to drink his whiskey with him.

Outside of natural ties, these seem to have been the only ones likely to be remembered by Wilson in disposing of his property.   He had no religion, nor any disposition to remember charitable objects.   He seems, by remarks, to have given hopes to both the Kidds and the Oldhams of being remembered in his will, though it is my opinion that Wilson did not intend the Kidds to know what his real purposes were. His only positive declarations in regard to his property were, that he did not want the government to get it, and that he did not intend to leave anything to his sister or her descendants, if she, or any of them, were living.   This implied an intention to make a will.   By this will, Wilson gives to Howard N. Kidd, $300; to Herman E. Kidd, $500; to Gov. Millspaugh, Jr., $100; to John Bowman, $300; to John L. Hart, $300; and the residue to Elenor Oldham.   The estate was valued at about $23,000.

At the time Wilson asked to have Hart sent for, to prepare this will, the only persons present with him were Herman Kidd, Gov. Millspaugh, Jr., and Cornelius Lake.   After Hart came, the only other persons who came in were the two witnesses to the will. No member of the Oldham family was present, and it does not appear that they knew what was being done. Herman Kidd and Gov. Millspaugh, Jr., have appeared as hostile witnesses on the probate, and undue influence cannot be charged to them.   The witnesses to the will and Lake have no interest under the will,

and, as far as we know, will not be benefited or injured by the admission or rejection of the will. The only other person present was "Squire" Hart, who is given a legacy of $300.

The law is well settled that, in order to avoid a will upon the ground of undue influence, the "influence must be such as to overpower and subject the will of the testator, thus producing a disposition of the property the testator would not have made if left freely to act his own pleasure;" and this must be proved like any other fact. It must not be guessed out. If Hart was the sole or the principal legatee, under the circumstances of this case, a presumption might have been raised, unfavorable to the validity of the will. No such relation is shown to exist between him and Elenor Oldham as in any way to impeach his acts in connection with the execution of the will; nor is there any evidence of any such influence on the part of Elenor Oldham, or any of her family. Her mother is proved to have spoken to Wilson twice upon the subject of his will. On both occasions she says the subject was introduced by him. Elenor on several occasions called on him and brought him delicacies to eat. And her father says that, on the occasion when Wilson gave him the savings bank book for his daughter, Wilson mentioned his intention of providing for her. The evidence fails to establish any such influence on the part of any one, upon John Wilson's mind, as would have induced him to make any other than such a disposition of his property as he desired to make.

He was very feeble at the time, but appears to have had a complete understanding of his wishes and

desires as to how he intended to dispose of his property. Hart says* Wilson sat upon the bedside, and told him what he wanted, and as Wilson did so, he wrote it down on a piece of paper with a pencil; and although Wilson was asked to lie down while the will was being drawn, he, Wilson, said he would sit up, and did so ;—that he then taxed his strength too much is evidenced by the tremulous signature. After the will was written, it was read over to him, and in answer to Hart's question if that was what he wanted, he said it was. Upon a careful consideration of all the testimony, I have reached the conclusion that at this time John Wilson was competent to make a will, and not under any restraint.

The will will, therefore, be admitted to probate.

* NOTE BY THE SURROGATE.—Upon the hearing, the proponent called as a witness, John L. Hart, the executor, and upon objection being made because of a legacy to him in the will, the temporary administrator was called, who testified that Mr. Hart had delivered to him an instrument in writing, which was then offered in evidence. By this instrument, Hart released to the administrator all interest which he had under the will, the same to be of the same effect as though he had not been named in the will. The contestants objected to the admission of this paper, and to the admission of Hart's testimony, upon the grounds: That it did not operate to discharge the legacy; and, if it did, then it became in effect an assignment to the residuary legatee of the legacy, and in such case the witness could not testify on behalf of his assign (Code Civ. Pro., § 829).

The paper was received in evidence, and the testimony of Mr. Hart taken (Whelpley v. Loder, 1 *Dem.*, 368).

This case was taken to the general term, principally upon this point, and the Surrogate was there affirmed—opinion filed December term, 1885 (Mem., 38 *Hun*, 643), which, however, does not bring out this point.